# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

HEITHEM MOHAMMAD ABDUL KHALIQ, )
                                                 )
      Petitioner,                     )
                                                 )
v.                                           )      Case No. CIV-25-1154-SLP
                                                 )
KRISTI NOEM, et al.,                )
                                                 )
      Respondents.               )

## O R D E R

Before the Court is the Report and Recommendation [Doc. No. 26] of United States Magistrate Judge Chris M. Stephens, recommending the denial of habeas relief pursuant to 28 U.S.C. § 2241. Petitioner has filed an Objection [Doc. No. 27] and Respondents have filed their Response to the Objection [Doc. No. 28].[1] The matter is at issue. For the reasons that follow the Court respectfully DECLINES TO ADOPT the recommendation of the Magistrate Judge and finds that habeas relief should be GRANTED.

## I.    Introduction

Petitioner brings a petition for habeas relief pursuant to 28 U.S.C. § 2241 claiming that he is in custody "in violation of the Constitution or laws . . . of the United States," *id*. § 2241(c)(2), and seeking release from civil immigration detention.[2] Petitioner challenges

---

[1] Citations to the parties' briefing submissions and record reference the Court's ECF pagination.

[2] Petitioner is currently detained at Cimarron Correctional Facility in Cushing, Oklahoma. *See* https://locator.ice.gov/odls/#/results (last visited January 26, 2026).

his detention as a violation of the Fifth Amendment's Due Process Clause, relying on the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001). [3]

Petitioner is subject to an order of removal from the United States as a result of a state-court felony conviction.  His statutory ninety-day removal period expired more than five years ago. Petitioner was previously detained by the United States Immigrations and Customs Enforcement (ICE) from February 2020 until August 2021 – a period of approximately 19 months.   From August 2021 to March 2025, Petitioner was released from confinement and subject to an Order of Supervision (OOS).  However, in March 2025 ICE redetained Petitioner.

 Petitioner seeks his release from continued immigration detention because he argues there is no significant likelihood of his removal in the reasonably foreseeable future. As of the date of this Order, Petitioner has been redetained for approximately ten months.

The Magistrate Judge recommended denying the Petition.  The Magistrate Judge found, under *Zadvydas*, that there is a significant likelihood of Petitioner's removal to Jordan in the reasonably foreseeable future.

The Magistrate Judge found that *Zadvydas* applies but acknowledged that in *Zadvydas*, the petitioners sought relief from their *original* detention under 8 U.S.C. § 1231(a)(6) and not redetention as raised here.  *See* R&R at 8, n. 1.  As the Magistrate

---

[3] Petitioner brings a related statutory challenge under 8 U.S.C. § 1231(a) to his continued redetention.  That challenge, in turn, relies on *Zadvydas*.  *See* Pet., Count Two, at 8-9, citing *Zadvydas* and alleging that "[b]ecause Petitioner's removal is not reasonably foreseeable, his detention does not effectuate the purpose of the statute and is accordingly not authorized by § 1231(a)."

noted, Respondents rely on § 1231(a)(6) as the statutory authority upon which Petitioner is subject to redetention and "all parties focus their briefing on whether Petitioner's redetention is constitutional under *Zadvydas* alone." *Id*. Neither party challenges this finding so the Court confines its analysis accordingly.[4]

In his Objection, Petitioner argues that the Magistrate Judge erred by failing to aggregate his initial period of detention and his continuing period of redetention. Petitioner further argues the Magistrate Judge did not properly follow the directive in *Zadvydas* that "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink." *Id*. at 701.

## II. <u>Factual Record</u>

The following facts are undisputed. Petitioner was born on March 27, 1974, in Saudi Arabia and is of Palestinian descent.[5] In 1990, he immigrated to the United States as a Lawful Permanent Resident. He held a temporary Jordanian passport.[6] The passport issued in 1989 and expired in 1994. *See* Doc. No. 23 at 19, 23.

---

[4] Petitioner attempts to raise, for the first time in his Objection, a new and additional issue as to the regulatory authority governing his redetention. As discussed infra, that issue is not properly before the Court.

[5] Initially, Respondents attested to the Court that Petitioner "was born in Jordan." *See* Nation Decl. [Doc. No. 10-1], ¶ 10. But after the Magistrate Judge directed further development of the record, *see* Order [Doc. No. 15], Respondents now attest that Petitioner was born in Saudi Arabia and is of Palestinian descent. *See* Nation Decl. [Doc. No. 18-1], ¶ 10.

[6] Petitioner disputed information provided by ICE that he held a Jordanian passport. Again, after the Magistrate Judge directed further development of the record, Petitioner now states that although he "cannot confirm he had a Jordanian passport, he does <u>not</u> currently dispute it[.]" *See* Suppl. Resp. [Doc. No. 20] at 3 (emphasis in original).

In January 2018, Petitioner entered a guilty plea in the District Court of Oklahoma County, State of Oklahoma, to charges of driving under the influence, possession of a controlled dangerous substance, possession of drug paraphernalia, and driving while privilege revoked. In April 2019, as a consequence of his felony conviction on those charges, Petitioner was turned over to ICE custody for removal proceedings. On August 30, 2019, an immigration judge ordered that Petitioner be removed to Saudi Arabia.[7] Petitioner's attempts to overturn the immigration judge's order of removal were unsuccessful.

Respondents have submitted the Declaration of Aaron Nation, a Deportation Officer employed by ICE, to establish certain facts related to ICE's removal efforts and Petitioner's detention history. *See* Nation Decl. [Doc. No. 18-1]. Sometime after July 2020, Petitioner's case was sent to ICE's Enforcement and Removal Operations (ERO) to execute the order of removal. *Id*., ¶ 6.[8] In September 2020, ERO sent a travel document request to the Consulate of Saudi Arabia. *Id*., ¶ 7. In December 2020, based on responses received by the Consulate of Saudi Arabia, ERO suspended efforts to obtain travel documents from Saudi Arabia.[9] ERO has subsequently focused its efforts on Petitioner's removal to Jordan.

---

[7] Petitioner was removable based on his state-court conviction for a controlled substance offense. *See* 8 U.S.C. § 1227(a)(2)(B)(i).

[8] ERO is an operational branch of ICE. *See* https://www.ice.gov/about-ice.

[9] The Consulate of Saudi Arabia notified ERO that Petitioner is not a Saudi citizen, that his last name was not correctly identified, and that the translation of the birth certificate submitted by Petitioner was not accurate. *See* Nation Decl., ¶ 8.

Mr. Nation states that he is "aware that Jordan issues passports to certain individuals of Palestinian descent." *Id.*, ¶ 10.[10] Mr. Nation further states that in January 2021, ERO sought assistance from the Consulate of Jordan to inquire about Petitioner's country of birth and country of citizenship. *Id.*, ¶ 9. But there is no record that any documentation was sent to Jordan on this date. *Id.*

In July 2021, ICE's Headquarters Removal International Operations (HQRIO) requested an update on travel documents from the Embassy of Jordan. Id., ¶ 11. But there is no record of the Jordanian Embassy responding to this request. *Id.*

In August 2021, Petitioner was released from custody.[11] Petitioner was subject to periodic check-ins under an OOS.

On March 6, 2025, at one of his periodic check-ins, Petitioner was taken into ICE custody and redetained. *Id.*, ¶ 14.[12] Approximately one month later, on April 13, 2025,

---

[10] Although Mr. Nation states that he is "aware" of the issuance of such passports, he provides no details or statistical information to support the assertion or even provide a generalized explanation as to why he is "aware" of the same.

[11] The parties dispute whether his release was due to reasons related to the COVID-19 pandemic, or whether his release was due to the ICE's inability to effect his removal, i.e., that his removal was not significantly likely in the reasonably foreseeable future. Respondents equivocate somewhat on contending release was due to COVID stating: "Petitioner's release was, *at least partly*, a function of his validated COVID risk factor *rather than solely* a function of there being no significant likelihood of removal in the reasonably foreseeable future." Resp. [Doc. No. 28] at 6 (emphasis added). The Magistrate Judge found that "[t]he reason for Petitioner's release does not impact the undersigned's analysis on whether he is currently entitled to release." R&R at 3, n. 4. Neither party challenges that finding or otherwise assert any claim that the reason for his release impacts analysis of the issues before the Court.

[12] There is no indication in the record that Petitioner has not been compliant with the terms of his OOS.

ERO sent a travel document request to the Embassy of Jordan.  *Id.*, ¶ 15.  There is no evidence in the record that ERO made any contact with the Jordanian Embassy in the four years between 2021 and the post-redetention April 13, 2025 travel document request.[13]

For the next seven months, ERO and/or HQRIO requested status updates from the Jordanian Embassy as to the travel document request.[14]  According to Mr. Nation, "[o]n July 31, 2025, ERO HQRIO stated the embassy is still waiting on approval from the Government of Jordan to issue a [travel document]."  Nation Decl., ¶ 21.[15]

On October 3, 2025, Petitioner filed the instant action.  Approximately one month later, on November 5, 2025, upon inquiry from ERO, an officer of the Jordanian Embassy advised that "emergency travel documents" could not be issued based on Petitioner's "temporary passport."  *Id.*, ¶ 23, 24.  But the officer gave instructions for submitting a new

---

[13] As evidence of the April 13, 2025 travel request, Mr. Nation refers to "Attachment A" to his Declaration.  *See* Nation Decl., ¶ 15.  Attachment A is a letter dated ***April 28, 2020***.  *See* Doc. No. 23 at 1-2.  It appears the date on the letter is a typographical error, though no explanation has been provided to the Court.  Coincidentally, April 28, 2020 is the date which appears on Petitioner's Form I-862 Notice to Appear for removal proceedings, which is also included as part of Attachment A to Mr. Nation's Declaration.  *See* Doc. No. 23 at 12.  Dates are particularly significant here.  As such, the Court has some pause about the inaccurate date reflected on the attachment particularly where the record shows other inaccuracies in Mr. Nation's Declaration about which the Magistrate Judge required clarification and supplementation.

[14] Specifically, ERO requested status updates on May 23, 2025 and July 23, 2025 and HQRIO requested status updates on May 26, 2025 and June 17, 2025.  Nation Decl., ¶¶ 17, 20, 21.

[15] Mr. Nation states that on June 2, 2025, ERO "issued a decision to continue [Petitioner's] detention" and "determined that his criminal history demonstrated he is a danger, and his removal is highly likely in the reasonably foreseeable future."  Nation Decl., ¶ 18.  The ERO decision is not included in the record and Respondents have not raised any issue or made any argument related to Petitioner's alleged dangerousness in their briefing submissions.

passport and advised that it "could take some time as they would need to get approval from the Jordanian authorities since [Petitioner] is detained." *Id*., ¶ 24.

On that same date, the forms required to be completed by Petitioner for submitting a new passport were "sent off to be translated." *Id*., ¶ 25. ERO anticipated that the forms would be "returned in a week or so" and that ERO would work with Petitioner to complete the forms. *Id*. As of the date of this filing, no further information has been provided to the Court as to the status of these forms.

Mr. Nation also states in his Declaration that "if the Jordanian Embassy does not issue a travel document, [then] ERO . . . intends to submit a travel document request to the Israeli Embassy for permission to travel to the West Bank if [Petitioner] completes the travel document request." *Id*., ¶ 30. As part of any such document request, Mr. Nation states Petitioner's passport, birth certificate and pages of his parents' passport which reflect they are Palestinian will be included and characterizes the same as "strong evidence of [Petitioner's] nationality for approval to travel to Palestine." *Id*. Mr. Nation further states that "[b]ased on Palestine's acceptance of flights, and the record of acceptance of individuals of Palestinian descent to Palestine, [he] believe[s] [Petitioner's] removal is significantly likely in the reasonably foreseeable future." *Id*.[16]

---

[16] As with Mr. Nation's statements about the likelihood of Jordan's issuance of a passport to Petitioner, Mr. Nation provides no details or statistical information to support these assertions. Because the Magistrate Judge deemed Petitioner's removal to Jordan significantly likely in the reasonably foreseeable future, the Magistrate Judge did not address "the alternative removal plan of Petitioner to Palestine through Israel." R&R at 16, n. 9.

III.    **Findings of the Magistrate Judge**

The Magistrate Judge denied relief to Petitioner.  The Magistrate Judge determined that "a delay in the issuance of necessary travel documents by the country to which ICE is seeking to remove him" is insufficient to satisfy Petitioner's burden to show that his removal is "not significantly likely in the reasonably foreseeable future."  R&R at 11, 12. The Magistrate Judge based this finding on the "travel document requests and responses from Jordan."  *Id.* at 10, 11.  The Magistrate Judge further determined that "the fact that a foreign government has not yet issued travel documents to a petitioner with a pending request and ties to that country does not mean that his removal is not significantly likely in the reasonably foreseeable future."  *Id.* at 12.  And the Magistrate Judge noted that only when delays are "extraordinarily long" does an inference arise that "travel documents will likely never issue."  *Id.* at 13.

The Magistrate Judge also determined that even if Petitioner had met his burden to show that his removal is not significantly likely in the reasonably foreseeable future, Respondents had sufficiently rebutted that showing.  The Magistrate Judge pointed to the "indicat[ion]" from Respondents that "the Jordanian Embassy has provided instructions for applying for a new passport for Petitioner and that the process could take some time."  *Id.* at 14.  The Magistrate Judge further found that "ERO has taken numerous steps to secure travel documents and effectuate Petitioner's removal, including multiple communications with the Embassy of Jordan to obtain the proper documents for Petitioner's removal to Jordan."  *Id.* at 15.

In reaching these conclusions, the Magistrate Judge acknowledged that "Petitioner has been detained post-removal for nearly nine months this year" but found nonetheless that the "government is making reasonably substantial efforts to remove him, and Jordan appears to be cooperating with those efforts." *Id*. at 16.  The Magistrate Judge noted, however, that "this may change in the future, and Petitioner is not precluded from filing another habeas petition if removal to Jordan is no longer significantly likely to occur in the reasonably foreseeable future." *Id*.

## IV.    **Petitioner's Objections**

Petitioner raises the following objections to the findings of the Magistrate Judge. First, Petitioner argues the Magistrate Judge erred when focusing solely on the nine-month period of confinement on redetention.  Petitioner argues the Magistrate Judge should have also considered the period of his prior detention on his order of removal.[17]  This is important, Petitioner argues, because under *Zadvydas*, "as the period of post-order confinement grows, the period of the reasonably foreseeable future shrinks."  Obj. at 3. Petitioner refers to this principle as the *Zadvydas* "rule of relativism."  *Id*.  Petitioner further argues the alleged error of the Magistrate Judge was compounded by his failure to "meaningfully consider the evidentiary effect of the government's prior unsuccessful deportation efforts and prior finding that release on OOS was appropriate in light of the lack of any significant likelihood of removal in the reasonably foreseeable future."  *Id*. at

---

[17] According to Petitioner, when aggregating his prior detention and his current detention, he has been detained for approximately 2.21 years.  *See* Obj. at 3.

4.[18] Finally, Petitioner contends he has established "clear barriers to third country removal" and contests the Magistrate Judge's findings that his removal to Jordan is significantly likely in the reasonably foreseeable future.  Obj. at 10-12.

## V.     Discussion

### A.     Legal Framework

Petitioner has been ordered removed from the United States, but his removal was not effected within the statutory 90-day removal period.  *See* 8 U.S.C. § 1231(a)(1)(A). Petitioner, nonetheless, is subject to continued detention after expiration of the removal period pursuant to 8 U.S.C. § 1231(a)(6).[19]  Such detention is civil and nonpunitive. *Zadvydas*, 533 U.S. at 690.

---

[18] In his Objection, Petitioner purports to raise a new issue not included in the Petition – whether the revocation of Petitioner's OOS was lawful under 8 C.F.R. § 241.13(g) or (i)(2)-(3) or under 8 C.F.R. § 241.4(c), (i)(7).  *See* Obj. at 7.  That Court does not address that issue.  *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."); *see also Martinez v. Martinez*, No. 24-2105, 2025 WL 2424161 at *3 (10th Cir. Aug. 22, 2025) (citing *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001) ("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived.")).

[19] Section 1236(a)(6) provides:

> An alien ordered removed who is inadmissible under section 1182, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the [the Secretary of Homeland Security] to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

There is no express limitation on the length of an alien's post-removal-period detention under § 1231(a)(6). But in *Zadvydas*, the Supreme Court interpreted § 1231(a)(6) narrowly and imposed "an implicit 'reasonable time' limitation" on such detention to avoid any Fifth Amendment due process issues that could arise from indefinite detention. *Id.*, 533 U.S. at 682. After *Zadvydas*, an alien can be detained only "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701.

In applying this limitation in the context of a habeas challenge to continued detention, the ultimate question for the court is "whether the detention in question exceeds a period reasonably necessary to secure removal." *Id.* at 699. Significantly, the decision to be rendered by the Court is not "[t]he choice . . . between imprisonment and the alien 'living at large'" but "between imprisonment and supervision under release conditions that may not be violated." *Id.* at 696.

Reasonableness is measured "primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." *Id.* at 699. A six-month period of detention is presumptively reasonable. *Id.* at 701. After the six-month period has passed, however, the alien has the initial burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If the alien makes such a showing, "the [g]overnment must respond with evidence sufficient to rebut the showing." *Id.*

The six-month presumption "does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has

been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Nevertheless, "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id*.[20]

The definitive issue addressed in *Zadvydas* is contextually important and bears repeating here: "Whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States." *Id*. at 695. As the Supreme Court noted, detention, like that of Petitioner that occurs after the 90-day removal period, "has no obvious termination point." *Id*. at 697.

What constitutes a "significant likelihood of removal" and how to measure the "reasonably foreseeable future," particularly in light of the "rule of relativism" identified in *Zadvydas*, is incapable of any bright-line delineation. Instead the analysis is case-specific and fact driven. For that reason, district courts across the country have utilized an array of approaches in deciding when continued post-removal-period detention of an immigrant becomes unconstitutional and reached varying conclusions.

Courts have looked to whether the mere passage of time is sufficient[21], whether the petitioner's case fits within certain defined circumstances,[22] or whether the petitioner is

---

[20] Petitioner makes reference to this principle as "the *Zadvydas* rule of relativism." Obj. at 3.

[21] *See, e.g., Wray v. Mukasey*, No. CIV.A.-08-6042-WJM, 2009 WL 1834318 at *5 (D.N.J. June 26, 2009) (noting that "[f]ederal courts disagree as to the extent to which the passage of time can suffice to meet the alien's burden" to show his removal is not reasonably foreseeable and citing cases).

[22] *See, e.g, Ahmed v. Brott*, No. CIV-14-5000-DSD/BRT, 2015 WL 1542131 at *4 (D. Minn. Mar. 17, 2015) (identifying "five types of cases" where courts have found no significant likelihood of

similarly situated to the two petitioners in *Zadvydas*.[23]  Within this judicial district, judges, including the undersigned, have also looked to whether the petitioner has demonstrated "institutional barriers to repatriation or obstacles particular to his removal."  *Dusabe v. Jones*, No. 24-464-SLP, 2024 WL 5465749 at *3 (W.D. Okla. Aug. 27, 2024), *report and recommendation adopted*, 2025 WL 486679 (W.D. Okla. Feb. 13, 2025).[24]

The Court is unaware of any Tenth Circuit precedent to address these standards post-*Zadvydas* in the context raised here.[25]  Thus, in addressing the current record, the Court focuses on the directives set forth in *Zadvydas* as the guide to its analysis.

_____

removal to include: "(1) where the detainee is stateless and no country will accept him; (2) where the detainee's country of origin refuses to issue a travel document; (3) where there is no repatriation agreement between the detainee's native country and the United States; (4) where political conditions in the country of origin render removal virtually impossible; and (5) where a foreign country's delay in issuing travel documents is so extraordinarily long that the delay itself warrants an inference that the documents will likely never issue" (citing cases)).

[23] *See, e.g., Fahim v. Ashcroft*, 227 F.Supp.2d 1359, 1366-67 (N.D. Ga. 2002) (addressing limited circumstances confronted by the Supreme Court in *Zadvydas*, i.e., Zadvydas "had no country" and Ma's country "had no treaty with the United States" and noting Supreme Court's "silence on the practical ramifications of its holding" leaving federal district courts to put "meat on the bones" of the holding and "arrive at standards of reasonableness that . . . make sense").  In *Fahim*, the court concluded that "the reasonableness of detentions pending deportation cannot be divorced from the reality of the bureaucratic delays that almost always attend such removals."  *Id*. at 1367.

[24] In *Dusabe*, petitioner did not dispute that Rwanda was his county of birth and citizenship.  Nor did he argue that the Rwandan government had rejected immigration officials' attempts to obtain travel documents for him.  Significantly, a Rwandan Embassy official had advised ICE that it would be issuing travel documents for the petitioner but the review by the Rwandan government had to be completed and would take some time.  The evidence included several communications back and forth between ICE and the Rwandan Consulate confirming that review was ongoing and that issuance of travel documents was anticipated.  Thus, the delay in *Dusabe* was "a result of Rwanda's slow machinations and not a denial or refusal to accept him."  *Id*., 2024 WL 5465749 at *4.  Under those facts, this Court concluded that Petitioner had not met his burden to show there was no significant likelihood of his removal in the reasonably foreseeable future.  *Id*.

[25] In *Soberanos v. Comfort*, 388 F.3d 1305, 1311 (10th Cir. 2004), the Tenth Circuit dealt with the distinct issue of continued detention "directly associated with a judicial review process that has a

### 1.    The Length of Petitioner's Detention is Beyond What is Presumptively Reasonable

There is no dispute that Petitioner has been redetained beyond the six-month presumptively reasonable period of detention.  And that was true as of the date he filed his Petition.  At that time, he had been redetained for approximately seven months.  And, as set forth, that redetention is now at the approximately ten-month mark and continues to grow.

### 2.    Petitioner has Shown Good Reason to Believe that There is No Significant Likelihood of Removal in the Reasonably Foreseeable Future

At issue in Petitioner's Objection is whether the Court should consider Petitioner's prior post-removal detention in addressing the reasonableness of his continued detention, i.e., whether the Court should aggregate the two periods of detention.  The Magistrate Judge considered only Petitioner's period of current detention.  *See, e.g.*, R&R at 8 (addressing undisputed fact that "Petitioner has been re-detained since March 2025").  As the parties' briefing submissions demonstrate, courts are decidedly split on the aggregation

---

definite and evidently impending termination point" and thus was "clearly neither indefinite nor potentially permanent like the detention held improper in *Zadvydas*."  In one unpublished decision, the Tenth Circuit denied § 2241 habeas relief under *Zadvydas*, concluding that the petitioner's detention did not "raise the specter of indefinite detention" where the record demonstrated ICE officials were "actively seeking [the petitioner's] removal and there [was] no indication they w[ould] not succeed."  *Abiodun v. Mukasey*, 264 F. App'x 726, 729 (10th Cir. 2008).  In reaching this conclusion, the court noted that it was "troubled" by "the inability of ICE to secure [the petitioner's] removal in a timely manner, even given [the petitioner's] repeated court filings and failure to cooperate."  *Id*.  The record showed that the petitioner was awaiting deportation to his homeland of Nigeria, that ICE had attempted to obtain travel documents and place the petitioner on a chartered flight to Nigeria "on multiple occasions" and that the main reason the petitioner had not been removed was due to "his repeated court challenges to removal and refusal to cooperate with ICE officials in obtaining a Nigerian passport and other necessary travel documents."  *Id*.

issue. *See* Obj. at 5-7 (citing cases in support of aggregation); Resp. to Obj. at 6-7 (citing cases declining to aggregate periods of detention).

The Court finds a definitive ruling on the issue of aggregation is not necessary in this case. As noted, Petitioner's current redetention exceeded the presumptively reasonable six-month period at the time of filing the Petition. Thus, he has established a prima facie *Zadvydas* claim. To this end, although the *length* of the prior period of post-removal detention need not necessarily be considered here, the Court finds that ICE's unsuccessful *efforts* at removing Petitioner during that prior period of post-removal detention remain relevant.

Petitioner has shown good cause to believe that there is no significant likelihood of removal in the reasonably foreseeable future. The record shows it has been almost six years since Petitioner's 90-day removal period expired. And five years ago – in December 2020 – ICE abandoned its efforts to obtain travel documents to Saudi Arabia.

In the ensuing five years, ICE has been unable to secure travel documents to Jordan for Petitioner. The record is void of any meaningful, ongoing efforts by ERO to remove Petitioner to Jordan during the period between his initial post-removal detention and his redetention. At best, those efforts have been sporadic. Moreover, it has taken seven months during his redetention for ERO to receive any "definitive" response from the Jordanian Embassy. When ERO did receive such a response, it merely indicated the process would have to start anew with an application for a passport.

Significantly, ERO does not state that a new passport will likely issue, only that the Jordanian Embassy has provided "instructions for submitting a new application" and a

caution that "the process could take some time."  Nation Decl., ¶ 4.  Moreover, as to any new passport application, there has been no supplementation of the record to indicate that the necessary paperwork has now been translated and provided to Petitioner.

And finally, although ICE claims it is going to pursue travel documents to Palestine, no communications with that country have yet been initiated.  *See* Nation Decl., ¶ 30 (noting ERO "intends to" submit a travel document request to the Israeli Embassy "if" the Jordanian Embassy does not issue a travel document).  Given the length of Petitioner's current detention, the Court finds Petitioner has shown good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.

### 3.    Respondents Have Failed to Rebut Petitioner's Showing

Respondents' showing of a significant likelihood of Petitioner's removal in the reasonably foreseeable future is limited to the following statement by Mr. Nation: "Because the Jordanian Embassy has responded to our requests for updates on the travel document, and included instructions for a new passport, I believe it is likely that they will renew his passport and issue travel documents."  *Id.*, ¶ 27.  This evidence is rather threadbare, particularly given the fact that communications with the Jordanian Embassy began in 2021.

Respondents provide no evidence to support Mr. Nation's statements.  For example, Respondents provide no evidence as to the number of aliens that have been removed to Jordan during Petitioner's periods of detention, or any other evidence as to the prospects of the removal of such aliens.  Instead, in wholly conclusory fashion, Mr. Nation asserts that "given the prioritization of removing individuals with final removal orders, there has been an increase in overall removals of individuals, to include removals to Jordan."  *Id.*,

¶ 29.  There is no reference to any data underlying this statement and it so conclusory, that it is difficult to discern whether the declarant even has personal knowledge of any alleged increase in removals to Jordan.

The Magistrate Judge found that Jordan "appears to be cooperating" with removal efforts, but the Court finds the record does not necessarily support such an inference. Certainly the record shows there were multiple inquiries by ICE to Jordan officials that went unanswered.  Regardless, whether Jordan is cooperating is not dispositive.  Rather, the issue is whether removal is significantly likely in the reasonably foreseeable future.  To this end, in *Zadvydas*, the Supreme Court expressly rejected the Fifth Circuit's holding that continued detention is lawful "as long as 'good faith efforts to effectuate . . . deportation continue" and the detainee fails to show that "deportation will prove 'impossible.'"  *Id*. at 702.  As the Supreme Court instructed: "this standard would seem to require an alien to show the absence of *any* prospect of removal – no matter how unlikely or unforeseeable – which demands more than [the Supreme Court's] reading of the statute can bear."  *Id*. (emphasis in original).

The Magistrate Judge also relied on the fact that "Petitioner was previously issued a passport by the Government of Jordan."  R&R at 9.  But as set forth, that passport – a temporary one – was issued in 1989 and expired in 1995 – more than thirty years ago.  The passport issued when Petitioner was a child.  Mr. Nation implicitly acknowledges that Petitioner's adult criminal history was a reason provided by the Jordanian Embassy as to why Petitioner could face barriers to issuance of a new passport.  Nation Decl., ¶ 24 ("The officer [from the Jordanian Embassy] said the process could take some time as they would

need to get approval from the Jordanian authorities *since [Petitioner] is detained*.") (emphasis added).

Petitioner's only other ties to Jordan are based on two facts: (1) his parents (born in Palestine) had Jordanian passports issued in 1990; and (2) his older brother, born in 1955, has a birth certificate from Jordan. *See* R&R at 9 (citing Doc. No. 23 at 14).[26]   But the record indicates Petitioner's "five older brothers and one older sister" are now all United States citizens. *See* Doc. No. 18-2 at 5 (Decision of the Immigration Judge in Removal Proceedings).  And it appears that Petitioner's mother, who is in her eighties, has been in the United States since Petitioner's arrival in 1990. *See id*. at 1-3.

Additionally, although the Magistrate Judge acknowledged that what counts as the reasonably foreseeable future "shrinks" as the period of postremoval confinement increases, the Magistrate Judge did not further address this issue, instead noting that Petitioner "is not precluded from filing another habeas petition if removal is no longer likely to occur in the reasonably foreseeable future." R&R at 16.  But the R&R provides no direction to Petitioner with respect to any guideposts that would signal it was time to refile.

Although the Court ultimately disagrees with the findings of the Magistrate Judge, the Court does so cautiously and underscores that this case presents a close call.   As set

---

[26]    As to the birth certificate, the Court notes that during Petitioner's period of redetention an ICE Officer showed Petitioner the birth certificate and purported that it belonged to Petitioner, but Petitioner was adamant that the birth certificate belonged to his oldest brother. *See* Walsh Aff. [Doc. No. 12-1], ¶¶ 9-11.  Respondents now acknowledge that Petitioner has no birth certificate from Jordan.

forth above, post-*Zadvydas*, courts have disagreed whether the passage of time, alone, is sufficient to establish that removal is not likely to occur in the reasonably foreseeable future. But here, the passage of time together with the additional record before the Court leads to the conclusion that Petitioner is entitled to relief.

Prior efforts by ICE to remove Petitioner – over the course of nearly five years – have been sporadic and unsuccessful. The rebuttal evidence submitted by Respondents is scant – an invitation from Jordan to essentially "start anew" with the passport application process. The record lacks any evidence to show that removal of aliens similarly situated to Petitioner (or even removal of aliens to Jordan, generally) has been successful. And Petitioner's ties to Jordan, while not non-existent, are significantly attenuated. Under these circumstances, the passage of time takes on more significance as inaction and/or lack of progress in effectuating removal is precisely what *Zadvydas* guards against. *See, e.g., Douglas v. Baker*, No. 25-cv-2243-ABA, 2025 WL 2997585 at *3, 4 (D. Md. Oct. 24, 2025) (finding that passage of time coupled with "the absence of any evidence that the government has used that time to advance efforts to remove" the petitioner demonstrate that detention no longer authorized by *Zadvydas* (citing cases)).

Accordingly, the Court finds that Petitioner's removal is not significantly likely in the reasonably foreseeable future. Petitioner is entitled to habeas relief pursuant to 28 U.S.C. § 2241 as he is in custody "in violation of the Constitution or laws . . . of the United States." *Id*. § 2241(c)(2).

VI.    **Conclusion**

IT IS THEREFORE ORDERED as follows:

1.    The Court DECLINES to ADOPT the Report and Recommendation [Doc. No. 26] and GRANTS the Petition for Writ of Habeas Corpus [Doc. No. 1] to the extent it seeks habeas relief pursuant to 28 U.S.C. § 2241.

2.    The Court ORDERS that Petitioner be released from custody immediately, subject to an appropriate Order of Supervision.[27]

3.    The Court DIRECTS Respondents to submit a declaration, pursuant to 28 U.S.C. § 1746, within 7 days of the date of this Order confirming Petitioner's release from custody.

3.    The Court DENIES as MOOT Petitioner's Emergency Motion or Request for Expedited Handling [Doc. No. 25].

IT IS SO ORDERED this 26th day of January, 2026.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

---

[27] *See Zadvydas*, 533 U.S. at 700 ("[T]he alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions." (citations omitted)).